UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADRIAN TARAU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 15-CV-03545 |
| v. | ) |
| | ) Judge Joan B. Gottschall |
| LUCIAN COLTEA and AURICA COLTEA, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| LUCIAN COLTEA, | ) |
| | ) |
| Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ADRIAN TARAU, | ) |
| | ) |
| Counter-Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Adrian Tarau ("Tarau") and Lucian Coltea ("Coltea") met in 1999 and soon began a business relationship investing in real estate in Romania and Chicago, Illinois. (*See* Pl.'s Resp. to Defs.' L.R. 56.1(a)(3) Statement Material Facts ("Pl.'s SOF Resp."), ECF No. 98; Tarau Dep. 8:19–9:12, ECF No. 71-1.) Coltea bought a Romanian castle for $400,000 in 2003 and sold it for a handsome profit: €10.6 million or approximately $13.65 million at the exchange rate for August 2008.[1] (*See* ECF No. 104 ¶¶ 5, 12.) In this diversity suit,[2] Tarau alleges that Coltea breached a written agreement the two signed in 2007 entitling him to 25% of profits from the sale ("the 2007 agreement"). Coltea and his wife, former codefendant Aurica Coltea ("A.

---

[1] In his response, Tarau represents that the exchange rate in August 2008 was €1 to $0.7768; however his calculations are consistent with an exchange rate of $1 to €0.7768, which is the rate the court used for this opinion. (*See* ECF No. 99 n.1.)
[2] Tarau resides in Romania; Coltea and his wife, Aurica Coltea, live in Illinois. (Pl.'s SOF Resp. ¶¶ 1, 2.)

Coltea"), move for summary judgment. They primarily argue that the 2007 agreement is not a valid contract because Tarau gave no consideration for it.

## I. BACKGROUND

Except where otherwise noted, the court draws the following undisputed facts from the parties' Local Rule 56.1 statements. *See, e.g.*, *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 714 (N.D. Ill. 2016) ("The facts underlying summary judgment proceedings are drawn from the parties' Local Rule 56.1 submissions."); *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 681 (N.D. Ill. 2015) (same).

In his reply, Coltea argues that paragraphs 6, 8, 10, and 13 of Tarau's Local Rule 56.1 response do not properly dispute the facts asserted, and so those facts should be deemed admitted. (*See* ECF No. 102 at 1–4.) To the extent Tarau's Local Rule 56.1(b)(3) response asserts new facts, the court disregards them. *See Kirsch*, 78 F. Supp. 3d at 681 (citing *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 744 (N.D. Ill. 2011)) (disregarding new factual assertions in L.R. 56.1(b)(3) response). The court notes, however, that most, if not all, of the new facts appear in Tarau's Local Rule 56.1(b)(3)(C) statement of additional facts. (*Compare, e.g.*, ECF No. 98 ¶ 6, *with* ECF No. 104 ¶¶ 3–4.) Moreover, the court cannot see, and Coltea does not explain, how those facts make any difference to the disposition of his motion. The dispute in paragraph 8, for instance, over whether "Tarau testified that his business dealings with Coltea involved only one Romanian castle, which is the castle at issue here" (ECF No. 71 ¶ 8 (citation omitted)) does not matter. No party argues at summary judgment that there is any confusion about which castle is at issue. And in any event, it is undisputed that the parties had other business relationships. (*See* ECF No. 71 ¶ 3.) Because neither party contends these facts are material, the court need not resolve this dispute. *See, e.g.*, *Matter of the Compl. of Ingram Barge Co.*, 2016 A.M.C. 2582,

2593 n.2 (N.D. Ill. 2016) (declining to resolve fact dispute at summary judgment because it was not material). Ironically, highlighting Local Rule 56.1 violations on immaterial issues without clearly labeling them as immaterial invites the sort of sifting the rule is supposed to help avoid. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528–29 (7th Cir. 2000) (stating that Local Rule 56.1's purpose is to save the court from having to "wade through improper denials and legal argument in search of a genuinely disputed fact").

In 2003, Tarau paid Coltea $200,000 in cash. (ECF No. 98 ¶¶ 6–7.) Tarau claims that he reached a verbal agreement with Coltea and two other business partners ("the 2003 agreement") to buy the Romanian castle. (Pl.'s Statement Additional Facts ¶¶ 3, 4, 13, ECF No. 100.) The verbal agreement, as Tarau describes it, also reallocated Tarau and Coltea's interests in other investments. *See id.*

Tarau described the terms of the 2003 agreement, the existence and terms of which Coltea disputes (see the next paragraph), at his deposition.[3] (*See* ECF No. 71-1 at 19:4–12.) According to Tarau, he and Coltea each contributed 50% ($200,000) of the castle's purchase price. (ECF No. 104 ¶ 13.) He, Coltea, and two additional partners agreed that he and Coltea were guaranteed the return of their $200,000 investment; after the first $400,000 was distributed to Coltea and Tarau, the remainder would be split among the four partners in equal shares. (*See* Tarau Dep. 19: 4–12; ECF No. 104 ¶¶ 13–14.)

Coltea disputes most of Tarau's testimony in his affidavit. He avers that Tarau "declined to participate in the purchase of the Castle" in 2003. (Coltea Aff. ¶ 5, ECF No. 104, Ex. A.)

---

[3] Tarau cites page 19 of Exhibit 3 to Coltea's Local Rule 56.1 statement of facts to support his characterization of the terms of the 2003 verbal agreement. (*See* ECF No. 98 ¶¶ 13, 14.) Exhibit 3 is the complaint filed in the 2005 lawsuit in Cook County Circuit Court, and it does not support the factual propositions for which it is cited. This appears to be a clerical error, however. In context, it is apparent that Tarau intended to cite his deposition, which is the first exhibit to Coltea's Local Rule 56.1 statement. As Coltea does not object to paragraphs 13 or 14 and page 19 of Tarau's deposition supports the factual propositions in paragraphs 13 and 14 of Tarau's statement of additional facts, the court treats those paragraphs as supported by a citation to the record.

Litigation over the 2003 purchase and other matters ensued in Romania and the United States. In 2004, the Romanian Ministry of Culture filed a lawsuit seeking cancellation of the castle's sale. (ECF No. 104 ¶ 6.) The parties disagree about when that lawsuit ended (Tarau says 2007 or 2008; Coltea says 2004), but it obviously ended favorably to Coltea. (*See* ECF No. 104 ¶ 7 and sources cited therein.)

Tarau also sued Coltea in Cook County, Illinois in 2005 ("the 2005 lawsuit"). (ECF No. 104 ¶ 8; ECF No. 98 ¶ 9; Compl., ECF No. 71 Ex. 3.) Tarau's complaint included an allegation that he "has knowledge that COLTEA financed the down payments of and/or remodeled a castle, and other real estate properties, in Romania with monies acquired during the course of TARAU's and COLTEA's business relationships." (ECF No. 71 Ex. 3 ¶ 158.) Tarau stated that he was entitled to profits from the sale of those Romanian properties because Coltea used "joint monies" to buy them even though Tarau never authorized him to do so. (*Id.* ¶¶ 159, 160.)

Tarau and Coltea settled the 2005 lawsuit in May 2005. (ECF No. 98 ¶ 12.) The written settlement agreement (the "2005 settlement agreement") provided, among other things, that Coltea would pay Tarau $50,000 (*see* Settlement Agreement ¶ 5, ECF No. 71-4) and that the two would deed certain Romanian and Chicago properties to one another (*id.* ¶¶ 4–6; ECF No. 98 ¶ 14). Tarau released Coltea:

> from any and all claims, demands, liens, releases, contracts, covenants, actions, suits, causes of action, including but not limited to actions for slander of title, contributions and an investment made by Tarau to C&T and Ashland European, obligations, controversies, debts, costs, expenses, damages, judgments, orders and liabilities of whatever kind of nature in law, equity or otherwise, including but not limited to any action based on the allegations out of which this settlement arose. Without, in any way, limiting the generality of the foregoing language, this Release shall include any and all claims, demands, or causes of action, arising out of, or in any way connected with any occurrence, acts, omissions, transactions, practices or policies, which were or could

> have been asserted relating to any claim whatsoever arising out of, or related to the Lawsuit, the entities, and the Parties involved.

(Settlement Agreement ¶ 19, ECF No. 71 Ex. 4.) The 2005 settlement agreement also provides for the recovery of attorney's fees. (*See id.* ¶ 21.) Coltea bases his counterclaim on that provision. He asserts that Tarau breached the 2005 settlement agreement by filing this lawsuit. (*See* ECF No. 42 ¶¶ 9–11.) Coltea does not seek summary judgment on his counterclaim now, however.

The 2007 Agreement reads:

> I, undersigned Lucian Coltea, domiciled at: 428 E 1st Street, Hinsdale, Illinois 60521, in my own name and on behalf of my wife, Aurica Coltea, in person do confirm that we agreed with Mr. Adrian Tarau, domiciled at 36 S. Ashland Avenue 402, Chicago, Illinois 60607, to buy the real estate property registered in CF 138N Busteni, Prahova, Romania, cadastral 200, purchased in accordance with the purchase contract certified by Gheorghita Albu under no. 2312/04.09.2003 with the intention to sell at a higher price, whereby, Mr. Tarau Adrian paid 50% of the purchase price with the condition that upon the sale, I will pay him an amount of 25% of the sale price.
>
> Also, individually, I obligate myself to sell the property at the highest possible price but not less than 2,000,000 Euros, and unequivocally to pay Adrian Tarau, within 10 days of the receipt of funds upon the sale, 25% of the selling price.
>
> This agreement is my will and cancels any prior written or oral agreement and it was finalized on August 27, 2007 in Chicago, Illinois, U.S.A.

(Agreement, ECF No. 106 Ex. A.) Coltea signed the agreement, which was written in the Romanian language. (*See id.* at 1, 3 (translator's certification).)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

5

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to, and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary") (citation omitted). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *See, e.g.*, *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. A. COLTEA'S MOTION FOR SUMMARY JUDGMENT IS MOOT

A. Coltea argues in the instant motion that Tarau cannot enforce the 2007 agreement against her because only her husband signed it, and it does not bind her under principles of

agency law. A written contract does not necessarily have to be signed to be enforceable. *McPherson v. ACCO USA, Inc.*, No. 95 C 5888, 1997 WL 598138, at *3 (N.D. Ill. Sept. 15, 1997) (citing *Lynge v. Kunstmann*, 418 N.E.2d 1140, 1144 (Ill. App. Ct. 1981)). Rather, in the absence of a signature, the question is whether "signing of the contract is a condition precedent to its becoming a binding contract [which] usually depends on the intention of the parties." *Id.* at *3 n.3 (quoting *Consol. Bearings Co. v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1231 (7th Cir. 1990)).

After the pending motion for summary judgment was filed, Tarau dropped his claims against A. Coltea when he filed his amended complaint. (*See* ECF No. 106 at 1.) Tarau's counsel stated at a later hearing that Tarau intended to dismiss his claims against A. Coltea without prejudice. (Minute Entry, June 28, 2017, ECF No. 109.) By moving for summary judgment, A. Coltea seeks a binding judgment that will preclude Tarau from suing her again under res judicata principles. *See, e.g.*, *Fluker v. Kankakee Cnty.*, 741 F.3d 787, 793 (7th Cir. 2013) (reasoning that because discovery had closed because motion for summary judgment was fully briefed, "the court had a complete factual record and all the information needed to resolve the case on the merits"); *Greer v. Cook Cnty.*, 54 F. App'x 232, 235–36 (7th Cir. 2002) (holding grant of summary judgment was judgment on the merits for res judicata purposes). She has not gotten what she wants, however. A dismissal without prejudice does not operate as an adjudication on the merits, so Tarau could sue A. Coltea again here or in another court. *See Paragon Sales & Serv., Inc. v. Onyx Arms Intern.*, No. 93 C 4039, 1997 WL 89230, at *4 (N.D. Ill. Feb. 25, 1997) (citations omitted) (after dropping a defendant from an amended complaint, "[t]he plaintiff may bring a new suit against the voluntarily-dismissed defendant"). Rule 41(a)(1), which governs voluntary dismissals, protects a defendant by requiring the defendant's

7

signature to dismiss an action without a court order once a motion for summary judgment has been filed. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). This rule "facilitate[s] the voluntary dismissal of an action, but safeguard[s] abuse by limiting its application to an early stage of the proceedings." *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 139 (7th Cir. 1978) (quotation omitted).

Tarau filed his amended complaint in response to a court order that directed him to "clear[ ] up the defects in the jurisdictional allegations" of his original complaint. (Order 5, June 2, 2017, ECF No. 101.) The court did not authorize Tarau to drop A. Coltea (*see id.*), and absent the Colteas' written consent, Tarau had to obtain leave from this court for all amendments to his complaint. *See* Fed. R. Civ. P. 15(a)(2). An amended complaint filed without leave of court may be stricken. *Jones v. United Airlines*, No. 11 C 6374, 2012 WL 6216741, at *9 (N.D. Ill. Dec. 13, 2012). So this court has the authority to order Tarau to amend his complaint to again name A. Coltea as a defendant and then adjudicate her motion for summary judgment. Consistent with the spirit of Rule 41(a)(1)(A)(ii), A. Coltea ought to have an opportunity to be heard on whether she will accept a dismissal without prejudice. Rule 15(a)(2), which requires the court to find that amending a complaint is in the interest of justice, provides that opportunity by assuring a defendant like A. Coltea a chance to be heard. The court will therefore require Tarau to follow the procedure for amending his complaint he should have followed in the first place.

Dropping A. Coltea in an unauthorized amendment has created another procedural problem. Whether A. Coltea still asserts a counterclaim against Tarau is not entirely clear. The court has previously remarked on the Colteas' pleading their counterclaim in a separate document rather than in their answer as Federal Rule of Civil Procedure 13(a) requires. (*See* Slip Op. at 9, ECF No. 82 (N.D. Ill. Feb. 2, 2017).) At the time, the issue appeared unimportant. (*See id.*) Now, it has created a small nuisance. The Colteas' separately-filed counterclaim still names

A. Coltea as a counterclaimant, even though Tarau has attempted to drop his claims against her. (*See* ECF No. 42 at 1.) Had the Colteas pleaded their counterclaim in their answer, their amended answer filed June 28, 2017 (ECF No. 108) would have clarified whether A. Coltea still presses her counterclaim. To tie up this loose thread, the court intends to strike the Colteas' separately filed counterclaim (ECF No. 42) and order them to file an amended answer in which they plead their counterclaim—but only after the question of whether the interest of justice favored allowing Tarau to drop A. Coltea has been settled. *See* Fed. R. Civ. P. 13(a), 7(a).

## IV. CONSIDERATION FOR THE 2007 AGREEMENT

The parties devote the lion's share of their briefing to the question of whether valid consideration supported the 2007 agreement. Tarau, who bears the burden of proving that a valid contract exists, has come forward with sufficient evidence to create a fact issue on the question. At summary judgment, his deposition testimony on the terms of the 2003 verbal agreement must be accepted as true. On his version of those terms and his and Coltea's later dealings, he agreed to forego a guaranteed return of his $200,000 when he made the 2007 agreement, which is sufficient consideration for modifying the 2003 agreement or the 2005 settlement.

### A. The Parties Agree That Illinois Law Governs

Before turning to the merits, the court must first determine what law governs the parties' dispute. *See, e.g.*, *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) (addressing choice of law even though parties did not directly raise it in their briefs because it was "clearly an important issue" in the case). According to the parties, the federal diversity statute, 28 U.S.C. § 1332(a), supplies the court with subject-matter jurisdiction over this case. The Colteas assert that "[s]ince this matter is before the Court on a diversity action, the Court should apply the substantive law of Illinois." Mot. Summ. J. 6, ECF No. 69 (citing *Ass'n*

9

*Benefit Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 849 (7th Cir. 2007)). That may be oversimplifying the matter somewhat. Ordinarily, "[f]ederal courts deciding state law claims under diversity jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016) (citing *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014)); *see also Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016) ("Generally, when a case is transferred from a district court with proper venue to another district court, the transferee court will apply the choice-of-law rules of the state in which the transferor court sits.").

Nevertheless, the court need not conduct a choice-of-law analysis here. "If no party raises a choice of law issue to the district court, 'the federal court may simply apply the forum state's substantive law.'" *Selective Ins.*, 845 F.3d at 266 (quoting *McCoy*, 760 F.3d at 684). Like the Colteas, Tarau cites Illinois law to establish what he contends are the substantive rules of decision. *See* ECF No. 99 at 3–6. He does not expressly challenge the Colteas' assertion that Illinois law governs. *See id.* Without a dispute between the parties over choice of law, the court applies Illinois law. *See, e.g.*, *Selective Ins.*, 845 F.3d at 266 (applying Illinois law even though contract included choice-of-law clause because parties argued the case under Illinois law in the district court); *Reynolds v. Lyman*, 220 F. Supp. 3d 889, 894 (N.D. Ill. 2016) (citations omitted) (applying Illinois law in diversity case because parties did not raise choice-of-law question).

**B. The Governing Law and the Parties' Arguments**

"Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Haywood v. Chi. Hous. Auth.*, 212 F. Supp. 3d 735, 741 (N.D. Ill. 2016) (quoting *Hess v. Bresney*, 784 F.3d 1154, 1158–59 (7th Cir. 2015))

(other citation omitted); *accord Cooke v. Jackson Nat'l Life Ins. Co.*, --- F. Supp. 3d ----, 2017 WL 1095055, at *5 (N.D. Ill. Mar. 20, 2017) (citing *Batson v. Oak Tree, Ltd.*, 2 N.E.3d 405, 414 (Ill. App. Ct. 2013)); *Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D. 302, 311 (N.D. Ill. 1995) (citations omitted). To form a valid contract (the first element), "the only things necessary are an offer, an acceptance, and consideration." *Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502*, 190 F. Supp. 3d 812, 818 (N.D. Ill. 2016) (quoting *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 936 (7th Cir. 2011)); *see also id.* at 818–19 (discussing need for definite and certain terms); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F. Supp. 2d 1063, 1080 (N.D. Ill. 2010) (citing *Carlton at the Lake, Inc. v. Barber*, 928 N.E.2d 1266, 1270 (Ill. App. Ct. 2010)) (listing definite and certain terms among elements of valid contract). Once a contract has been formed, separate consideration must be given to make an agreement to modify the contract valid. *See, e.g.*, *VC Mgmt., LLC v. Reliastar Life Ins. Co.*, 195 F. Supp. 3d 974, 985 (N.D. Ill. 2016) ("Under Illinois law, a valid modification of a contract 'must satisfy all criteria essential for a valid contract, including offer, acceptance, and consideration.'" (quoting *Nebel, Inc. v. Mid–City Nat'l Bank of Chi.*, 769 N.E.2d 45, 51–52 (Ill. App. Ct. 2002))); *Ross v. May Co.*, 880 N.E.2d 210, 216 (Ill. App. Ct. 2007) (describing the rule as "well settled" and citing *Lindsey v. Rosen*, 255 Ill. App. 21, 26 (1929)).

In contract law, consideration "consist[s] of something of detriment or disadvantage to one party or benefit to the other, and the bargained-for exchange between them." *Mulvey v. Carl Sandburg High Sch.*, 66 N.E.3d 507, 515 (Ill. App. Ct. 2016) (citing *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977)); *accord Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 564 (7th Cir. 2012) (quoting *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 679 n. 9 (7th Cir. 2005)). The Illinois Supreme Court has stated somewhat more concretely that consideration "consists of

'a bargained-for exchange of promises or performances, and may consist of a promise, an act or a forbearance.'" *Chandra v. Chandra*, 53 N.E.3d 186, 192 (Ill. 2016) (quoting *Carter v. SSC Odin Operating Co.*, 976 N.E.2d 344, 352 (Ill. 2012)). Consideration doctrine does "not require that the values . . . exchanged be equivalent," however. *Carter*, 976 N.E.2d at 352 (collecting and quoting authority).

Tarau takes two alternative positions. He claims the 2003 oral agreement was invalid under Illinois' statute of frauds until he and Coltea reduced it to writing in 2007, and so no consideration beyond the $200,000 payment he made in 2003 was necessary to make the 2007 agreement enforceable. In the alternative, Tarau points to his testimony that he changed the formula agreed to in 2003 by which his share of the profits from the castle's sale would be distributed when he signed the 2007 agreement. Because that change worked to his detriment, it furnished the consideration necessary for a contract modification under Tarau's analysis.

Coltea's motion for summary judgment hinges on what is sometimes called the preexisting duty rule, under which consideration already given for one contract cannot be reused for a separate, subsequent contract. *See, e.g.*, *A. Epstein & Sons Int'l., Inc. v. Eppstein Uhen Architects, Inc.*, 945 N.E.2d 18, 24 (Ill. App. Ct. 2011) (quoting *Johnson v. Johnson*, 614 N.E.2d 348, 355 (Ill. App. Ct. 1993)) ("[I]f the alleged consideration for a promise has been conferred prior to the promise upon which [the] alleged agreement is based, there is no valid contract."). Under this rule, a promise to perform an existing duty cannot serve as consideration to modify a later contract. *See, e.g.*, *Hanley v. Trendway Corp.*, 953 F. Supp. 232, 238 (N.D. Ill. 1996) (applying rule to find that purported modification of settlement agreement was unenforceable for lack of consideration). Coltea says that Tarau is judicially estopped from claiming that the 2003 verbal agreement existed, so the $200,000 he paid in 2003 should be viewed as the consideration

for the 2005 settlement agreement. Because the 2005 settlement agreement extinguished any contract concerning the castle, there was no contract to modify in 2007, and Tarau's consideration arguments fail.

### C. Whether the 2003 Oral Agreement Exists Is a Disputed Fact Issue; Tarau's Version Prevails

Tarau's testimony describing the terms of the 2003 agreement must be taken as true when deciding the motion. "The existence of an oral contract, its terms, and the intent of the parties are questions of fact" under Illinois law. *Anderson v. Kohler*, 922 N.E.2d 8, 18 (Ill. App. Ct. 2009).

According to Tarau, the verbal agreement called for him to invest $200,000 in exchange for a 25% stake in the profits from the castle's sale. Coltea says that the doctrine of judicial estoppel prevents Tarau from claiming they had an oral agreement concerning the castle. He points to allegations in Tarau's complaint filed in the 2005 lawsuit which he reads as inconsistent with the existence of an agreement regarding the castle. But Coltea makes his judicial-estoppel argument for the first time in his reply, leaving Tarau procedurally unable to respond. The doctrine that arguments made for the first time in a reply are waived prevents this sort of surprise attack. *See, e.g.*, *Quirin v. Lorillard Tobacco Co.*, No. 13 CV 2633, 2015 WL 128052, at *4 (N.D. Ill. Jan. 8, 2015) ("The reason for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues." (quoting *Satkar Hospitality Inc. v. Cook Cnty. Bd. of Review*, 819 F. Supp. 2d 727, 740 (N.D. Ill. 2011))). The court therefore takes Tarau's version of the 2003 verbal agreement's terms as true when deciding Coltea's motion for summary judgment.

## D. A Written Agreement Was Not a Prerequisite to Contract Formation

Taking Tarau's version of the 2003 oral agreement as true, Tarau has not carried his summary judgment burden on his theory that additional consideration was unnecessary for the 2007 agreement. Tarau grounds this theory on the premise that the 2003 agreement was initially voidable because it was not in writing, as Illinois' statute of frauds required. *See* 740 Ill. Comp. Stat. 80/2 (West 2017) (requiring real estate contracts covered by the statute of frauds to "be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party"); *Midwest Mfg. Holding, L.L.C. v. Donnelly Corp.*, 975 F. Supp. 1061, 1068 (N.D. Ill 1997) ("Under Illinois law, a contract that involves a transfer of real estate . . . must comport with the statute of frauds related to real estate."). Tarau relies on *In re Estate of Glassman*, 628 N.E.2d 666, 670 (Ill. App. Ct. 1993), for the rule that no oral contract exists "[w]here the reduction of an agreement to writing and its formal execution is intended by the parties as a condition precedent to its completion." Nonetheless, "the simple fact that a formal document will follow does not reduce an oral agreement to a 'negotiation' if 'the ultimate contract will be substantially based upon the same terms.'" *TRT Transp., Inc. v. Aksoy*, 506 F. App'x 511, 513 (7th Cir. 2013) (quoting *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 588 (7th Cir. 2012)) (harmonizing this proposition with the quoted language from *Glassman*). "Illinois courts measure the parties' intent objectively, considering their words and conduct but not their subjective beliefs" to determine whether a meeting of the minds occurred when they reached an oral agreement or whether they intended reducing the agreement to writing to be a prerequisite to the contract's formation. *Id.* at 513 (collecting cases). Some factors Illinois courts consider include: "whether the type of agreement involved is one usually put into writing; whether the agreement contains many or few details; whether the agreement involves a

large or small amount of money; whether the agreement requires a formal writing for the full expression of the covenants; and whether the negotiation indicated that a formal written document was contemplated at the completion of the negotiations." *Nomanbhoy Family Ltd. P'ship v. McDonald's Corp.*, 579 F. Supp. 2d 1071, 1096 (N.D. Ill. 2008) (citing *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990)) (other citation omitted); *In re Midway Airlines, Inc.*, 180 B.R. 851, 918 (Bankr. N.D. Ill. 1995) (citations and numbering omitted).

Tarau does not discuss those factors. Instead, he points to the facts that he paid Coltea $200,000 in 2003 and that the 2007 agreement was signed to show that "it is evident that the parties intended that the Oral Agreement be valid" (ECF No. 99 at 6). Those facts lend some support to Tarau. *See Nomanbhoy Family*, 579 F. Supp. 2d at 1096 (finding condition precedent in part because contract involved a large sum, and "[t]he contract was for the sale of land, and such contracts are invariably reduced to writing").

But Tarau points to nothing more in the summary judgment record showing he or Coltea said or implied anything in 2003 about a later written agreement. His deposition testimony, even viewed in the light most favorable to him, implies strongly that there was no meeting of the minds that a written agreement was a prerequisite to formation. Instead, Tarau testified that he did not ask Coltea to put the 2003 agreement in writing until 2005. (Tarau Dep. 43:4–6, ECF No. 71-1; *see also id.* at 42:13–43:2 (stating that Tarau did not ask for the agreement to be put in writing earlier, in part, because he trusted Coltea at the time).) Even viewed favorably to Tarau, his own testimony refutes any inference that he and Coltea contemplated reducing their oral agreement to writing in 2003. (*See id.*) Contemplating reducing an oral agreement to writing "where the ultimate contract will be substantially based upon the same terms" does not automatically make the writing a prerequisite to formation, *Citadel Grp.*, 692 F.3d at 588

(quoting *Quake Constr.*, 565 N.E.2d at 993) (ellipsis omitted), so Tarau's testimony, which does not go that far, does not either. Accordingly, Tarau has failed to show that a fact issue exists to support his theory that he and Coltea orally agreed in 2003 that a written agreement had to be created before they had a valid contract for the castle's sale.

E. **Whether the 2007 Agreement Validly Modified the 2003 or 2005 Agreement Is a Genuinely Disputed Fact Question**

Nevertheless, Tarau's testimony and the 2007 settlement agreement create a fact issue on his theory that the 2007 agreement is a valid contract modification supported by consideration. Tarau testified that the 2007 agreement changed the formula used to distribute profits from the sale. (*Compare* Tarau Dep. 19:4–12, *with* 2007 Agreement 2, ECF No. 106-1.) The 2003 agreement guaranteed that his $200,000 investment would be returned; his 25% share would then be computed as a fraction of whatever sale proceeds remained. (Tarau Dep. 19: 4–12.) The 2007 agreement made no such guarantee, but according to Tarau, it included an obligation that was not part of the oral agreement; Coltea had to sell the castle for at least 2 million euros. (*See* ECF No. 106-1 at 2.) Had it sold for that price, his one-quarter share under the 2003 agreement would have been approximately €628,733.27. His share of the same sale price falls to €500,000 under the 2007 agreement, but by setting a minimum sale price, he guaranteed that his $200,000 investment would yield a return because a sale for less than $400,000 would have netted him a loss before the alleged modification. Meanwhile, Coltea's share of profits from the sale increased in absolute Euros under the 2007 agreement, but he had to find a buyer who would pay at least 2 million Euros. Both Tarau and Coltea, therefore, gave up something of value in the 2007 agreement, so a fact-finder could reasonably conclude that it was supported by consideration on Tarau's version of events. *See Springhead, LLC v. Solution Publ'g, LLC*, No. 13 C 436, 2015 WL 1280702, at *1, 2 (N.D. Ill. Mar 18, 2015) (fact issue existed where one

16

party to alleged contract testified that parties agreed to modify contract to require one party to meet sales targets in exchange for receiving preferential treatment from the other); *Israel v. Israel*, No. 13 C 5271, 2014 WL 6685517, at *6 (N.D. Ill. Nov. 25, 2014) (holding settlement agreement was supported by consideration where one party relinquished right to receive profits from a project under a prior agreement in exchange for a guaranteed, fixed payment).

Coltea argues, again for the first time in his reply, that the 2005 settlement agreement terminated the 2003 agreement. While superficially appealing, this argument forgets that a settlement agreement is a contract like any other. *See, e.g.*, *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) ("A settlement agreement is a particular kind of contract, and so contract law (here, the law of Illinois) governs." (quoting *Newkirk v. Vill. of Steger*, 536 F.3d 771, 773 (7th Cir. 2008))); *In re Motorola Sec. Litig.*, 644 F.3d 511, 517 (7th Cir. 2011) (citation omitted) (adding that settlement agreements "are interpreted according to the law of the jurisdiction in which the contract was created"). Consequently, a settlement agreement can be rescinded or modified under controlling law like any other contract. *See United States v. Rand Motors*, 305 F.3d 770, 776 (7th Cir. 2002) (recognizing that settlement agreements can be modified or amended but finding that the settlement agreement at issue was not); *Steiner v. Eckert*, 995 N.E.2d 483, 488 (Ill. App. Ct. 2013) (holding trial court had sufficient evidentiary basis to find that subsequent forbearance agreement modified settlement agreement); *Quinlan v. Stouffe*, 823 N.E.2d 597, 605 (Ill. App. Ct. 2005) (holding in the alternative that evidence supported the trial court's finding that even if parties formed oral settlement agreement, they subsequently withdrew from it).

As just explained, a fact issue exists on whether valid consideration made the 2007 agreement enforceable as a contract modification. Assume for a moment that Coltea is right, and

the 2005 settlement agreement released the 2003 agreement.  It is undisputed that Coltea and Tarau entered into the 2005 settlement agreement, yet they signed the 2007 agreement.  Viewing these facts in the light most favorable to Tarau, a reasonable fact-finder could conclude that the 2007 agreement modified the 2005 settlement agreement by reinstating, or inaugurating, an agreement to sell the castle on new terms.  *See Steiner*, 995 N.E.2d at 489.

## V. CONCLUSION

For the reasons stated, the Colteas' motion for summary judgment (ECF No. 69) is denied in part.  The status conference set for 9/6/17 stands.  As discussed in Part III, Tarau has until August 23, 2017, to file, if he wishes, a motion seeking leave *nunc pro tunc* to amend his complaint to drop his claims against A. Coltea.  *See* Fed. R. Civ. P. 15(a)(2).


Date:  August 16, 2017                                     /s/
                                                    Joan B. Gottschall
                                                    United States District Judge